IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WADLEY CRUSHED STONE COMPANY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 3:17-CV-852-KFP |
| POSITIVE STEP, INC., d/b/a 1ST QUALITY EQUIPMENT COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Wadley Crushed Stone Company, LLC filed this lawsuit against Positive Step, Inc., d/b/a 1st Quality Equipment Company, asserting breach of contract claims arising from the development and production of a granite rock plant. 1st Quality filed two motions for summary judgment, one relating to Wadley's claims (Doc. 103) and one relating to its own counterclaim for unpaid invoices (Doc. 106). Wadley filed a response to both motions (Doc. 113), 1st Quality filed a reply (Doc. 118), and both Wadley and 1st Quality filed subsequent sur-replies (Docs. 122, 131). Upon consideration of both parties' submissions and the relevant law, both motions for summary judgment (Docs. 103, 106) are GRANTED for the reasons that follow.

## I.    PROCEDURAL HISTORY

On November 15, 2017, Wadley filed suit against 1st Quality in the Circuit Court for Randolph County, Alabama. Doc. 1-1. 1st Quality removed the case to this Court,

answered, and counterclaimed. Docs. 1, 7. Wadley then filed a First Amended Complaint (Doc. 10), which 1st Quality answered (Doc. 13). The Court subsequently granted Wadley leave to file a Second Amended Complaint (Doc. 33) and then a Third Amended Complaint (Doc. 46). The Third Amended Complaint asserted breach of contract claims and a misrepresentation claim against 1st Quality.

1st Quality filed a Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 49), arguing that (1) the breach of contract claims should be dismissed because they were time-barred by the four-year statute of limitations under the Uniform Commercial Code ("UCC") and (2) the misrepresentation claim should be dismissed because it failed to satisfy the specificity requirements for pleading fraud under the Federal Rules of Civil Procedure. Wadley filed a response to the motion (Doc. 52), and it also filed a Conditional Motion for Leave to Amend (Doc. 53) in the event the Court dismissed any of its claims in the Third Amended Complaint.

The Magistrate Judge previously assigned to this case granted both the Motion to Dismiss and the Conditional Motion for Leave to Amend. Doc. 66. Regarding Wadley's breach of contract claims, the Magistrate Judge found that they were time-barred by the UCC's four-year statute of limitations. *Id.* at 6. He reasoned:

> [T]his case concerns the purchase and sale of a granite aggregate processing plant. Though not limited to the machinery, the parties' commercial arrangement principally related to physical goods sold and delivered by [1st Quality]. Absent some countervailing circumstances, such arrangements are treated as the sale of goods subject to the dictates of Article 2 of the [UCC], even if ancillary services are provided and even though some of the goods delivered take on characteristics of fixtures.

*Id.* The Magistrate Judge then noted that Wadley filed suit in November of 2017, more than four years after the parties entered into their contract and the granite plant became operational in 2012. *Id.* at 5. He further noted that, "[b]ased on the history of the pleadings, the Court would not readily allow a further opportunity to amend" as to the statute of limitations issue; however, the Court nevertheless gave Wadley "a final opportunity to allege any additional facts it believes (consistent with the dictates of Rule 11, Fed. R. Civ. P.) could avoid application of this statute of limitations." *Id.* at 6.

On November 14, 2018, Wadley filed its Fourth Amended Complaint, which is the operative complaint in this action. Doc. 67. In its Fourth Amended Complaint, Wadley sues 1st Quality for breach of contract based on its failure to (1) provide a portable granite plant that could produce 500 tons per hour (Count I) and (2) design and provide equipment for a rail ballast loadout system that could load 2,000 tons of granite per hour (Count II). *Id.* at 15–18. 1st Quality filed a Motion to Dismiss Plaintiff's Fourth Amended Complaint (Doc. 68), again arguing that the UCC's four-year statute of limitations barred the breach of contract claims.

In its September 9, 2019 Memorandum Opinion and Order, the presiding Magistrate Judge denied 1st Quality's motion as to the breach of contract claims; "Taking as true the facts alleged in the Fourth Amended Complaint and construing them in the light most favorable to Plaintiff, *as is required at this stage*, it is plausible that the contract between the parties is for services."[1] Doc. 82 at 9–10 (emphasis in original). Thus, the Magistrate

---

[1] Magistrate Judge David A. Baker considered, and ultimately granted, 1st Quality's Motion to Dismiss

Judge declined to find, as a matter of law and without further development of the record, that Wadley's breach of contract claims were time-barred under the UCC.[2] 1st Quality then answered the Fourth Amended Complaint and asserted a counterclaim against Wadley for unpaid invoices, alleging that Wadley owes 1st Quality more than $100,000 for sold and delivered equipment parts. Doc. 83. Wadley filed an answer to the counterclaim (Doc. 84), arguing that it is entitled to a set-off as to the unpaid invoices. Finally, on August 28, 2020, 1st Quality filed its two motions for summary judgment currently pending before the Court.

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to

---

Plaintiff's Third Amendment Complaint. *See* Doc. 66. This case was subsequently reassigned, and Magistrate Judge Stephen M. Doyle considered 1st Quality's Motion to Dismiss Plaintiff's Fourth Amended Complaint. *See* Doc. 82. Judge Doyle dismissed only the misrepresentation claim brought in the Fourth Amended Complaint. *Id*.

[2] As will be discussed below, the applicable four-year statute of limitations applies to contracts wholly or predominantly for the sale of goods but not to contracts wholly or predominantly for the rendition of services. *See, e.g., Ole Mexican Foods, Inc. v. Hanson Staple Co.*, 285 Ga. 288 (2009) (discussing applicability of the UCC to "hybrid" contracts involving both goods and services).

find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992) (citation omitted). "Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

### III.   UNDISPUTED FACTS[3]

#### A.   The Parties

Wadley is an Alabama corporation with its principal place of business in Randolph County, Alabama. Doc. 113 at 4. Perry Donahoo served as Wadley's managing member during the startup phase of the company. *Id.* 1st Quality is a family-owned business in Alpharetta, Georgia, which represents manufacturers in the sale of equipment used in the aggregates industry; provides customer support and service in connection with those equipment sales; and supplies parts for some crusher makes and models from its warehouse. Doc. 104 at 10. Tom Curley serves as 1st Quality's Chief Financial Officer and Vice President. *Id.* Donahoo knew Curley because Curley previously sold equipment to companies for whom Donahoo worked. *Id.*

#### B.   The Initial Contract[4]

In 2009, Donahoo contacted Curley concerning a proposed granite plant. Doc. 104 at 10. Wadley wanted a plant with the capability of processing 500 tons per hour, and Donahoo believed Curley had the expertise to shepherd the plant project from start to finish. Doc. 113 at 6-7. Curley knew the specific output Donahoo and Wadley desired, and Curley agrees that the primary reason Wadley began working with 1st Quality was to "get

---

[3] The following facts are derived from 1st Quality's motions for summary judgment with attached exhibits and Wadley's response with attached exhibits. They are undisputed except where specifically noted.

[4] The parties entered into two contracts, first an Initial Contract and later a Modified Contract. The circumstances surrounding both contracts are relevant to the Court's analysis below; however, the issue before the Court is solely the nature of the parties' agreement at the time of, and as evidenced in, the Modified Contract. *See Samuels v. Cartledge*, 227 Ga. 211 (1971) ("An existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement, completely covering the subject matter which was embraced by the original contract.") (citations omitted).

a 500 [Ton Per Hour] granite plant built." Doc. 105-22 at 44. Over the following months, Curley communicated with Donahoo and several equipment manufacturers, suppliers, and contractors and ran Aggflow computer programs to size potential equipment for the plant. Doc. 104 at 10.

In May 2011, Curley consulted and subcontracted with engineers, contractors, and other vendors to become a part of building the plant. Doc. 113 at 8. He and 1st Quality had many questions regarding Wadley's production requirements for the plant. *Id.* In June 2011, Curley met with Donahoo, project engineer Mark Bielski, and other individuals at the proposed plant site. Doc. 104 at 11. They walked the site and discussed Donahoo's plans for the project and possible layouts and equipment for the plant. *Id.* Curley went to the site because the site would affect his selection of the equipment needed for the plant. Doc. 113 at 9. Curley acknowledges that, at that time, the goal was to "design a plant and lay out a plant to process granite." Doc. 105-22 at 19.

1st Quality initially contacted Bielski to design the plant and provide engineering support for the plant build-out. Doc. 113 at 9. On June 14, 2011, Bielski sent Donahoo preliminary "general arrangement" drawings, which depicted the concept for the plant layout recommended by 1st Quality. *Id.* Curley often acted as an intermediary between Wadley and Bielski. Doc. 105-22 at 34. He worked with the engineers when they had certain questions and gave them information necessary to complete engineering on the project. *Id.* Curley would also go to vendors to find equipment for the plant. *Id.* at 21. Curley does not dispute that he spent time selecting equipment to meet the specific needs of the plant. Doc. 113 at 15. In a November 14, 2011 letter, Curley informed Donahoo that,

8

"[s]ubject to proper maintenance, all of the [e]quipment we are supplying for the [Wadley] project will have a useful life of 20 years or more."[5] Docs. 113 at 10, 112-13 at 3.

On January 12, 2012, Donahoo and Curley met at 1st Quality's office, which was then located in Suwanee, Georgia, to review the scope of the project and the equipment involved. Doc. 104 at 11. Curley sent several contemporaneous emails to equipment suppliers and vendors referencing the January 12 meeting. *Id.* During that meeting, Donahoo decided on a portable ballast processing system and asked Curley to send an invoice to Wadley's office in Newnan, Georgia. *Id.* Before leaving, Donahoo stressed that he wanted to get the project going right away. *Id.* Donahoo asked Curley to email the invoice to him that afternoon so that Donahoo could review it when he returned home to Newnan, Georgia. *Id.*

Later that afternoon, Curley emailed an invoice for the Wadley portable primary system to Donahoo. *Id.* That evening, Donahoo emailed Curley a scan of the signed signature page and stated that he would send Curley the hard copy by mail. *Id.* at 11-12. Soon after, 1st Quality received the hard copy of the signed proposal dated January 12, 2012 (the "Initial Contract") in the mail. *Id.* at 12.

Upon receiving the Initial Contract, Curley began notifying numerous equipment manufacturers of the pending equipment orders and communicating with numerous

---

[5] It appears Curley wrote this letter at Donahoo's request, as a loan provider required this information. *See* Doc. 112-30. Specifically, in a November 14, 2011 email to Donahoo, the loan provider stated: "Normally our loan request funds consist primarily of the building/construction, however your request is primarily for the purchase of the FF&E and site work. Because of the uniqueness of your loan request I will need for the manufacturers of the equipment to be purchased [to] provide information on the useful life of the equipment.[] SBA needs confirmation from an outside third party that the equipment being financed will operate for the term of the loan." *Id.*

vendors. *Id.* Curley also notified Donahoo regarding the status of the equipment orders and the status of the engineer's plant design. *Id.* Additionally, Curley scheduled another meeting at the site with Donahoo and Bielski. *Id.*

The total selling price listed in the Initial Contract was $5,579,255, which allocated $4,140,255 for 27 items of equipment, $1,384,000 for "erection, installation & electrical," and $55,000 for "extra electrical." *Id.*; Doc. 105-8. Under the Initial Contract, the parties anticipated that 1st Quality would enter into a contract with Gaston Construction Company to perform all of the erection, installation, and electrical work. *Id.*; Doc. 105-1 at 5. However, notably, 1st Quality never actually entered into a contract with Gaston because Wadley decided to remove that work from its contract with 1st Quality and to instead work directly with Gaston for all of the erection, installation, and electrical work on the project. *Id.*

## C.     The Modified Contract

Approximately one month after Wadley signed the Initial Contract, Jimmy Stone, one of Wadley's owners, called Curley and asked if Wadley could work directly with Gaston and have the erection, installation, and electrical work removed from Wadley's contract with 1st Quality.[6] Docs. 104 at 12-13, 105-1 at 5. Curley, on behalf of 1st Quality, agreed. *Id.*

On February 22, 2012, Curley received an email from Stone stating, "[F]or reasons relative to the banking, bonding and insurance aspects of the project it will be best to have

---

[6] Wadley alleges that it made the decision to contract directly with Gaston to be the general contractor because 1st Quality was not licensed as a contractor in Alabama.

a contract directly between Wadley and Gaston." Docs. 104 at 13, 105-11. Attached to Stone's email was a copy of a contract between Wadley and Gaston that Wadley had prepared. *Id.* Consistent with Stone's email, on February 25, 2012, Curley emailed Donahoo to confirm that Wadley would work directly with Gaston and that Curley would send Donahoo "a revised proposal and amend the total number with the Purchase Order # WCS101 you issued to us on January 12, 2012." Docs. 104 at 13, 105-1 at 5, 105-12. Curley's February 25 email to Donahoo further stated:

> We have decided it is in the best interest of your Company to work directly with Gaston Construction on the erection, installation, concrete, surge tunnel and electrical portion of the plant and work with 1st Quality Equipment Company for all Conveyers, Screens, Vibrating Grizzly Feeder, Jaw, portable chassis for Jaw, all structures, belt scales, rail car load out load out structure and other fabrication as necessary within the plant.

Docs. 104 at 13, 105-12. That same day, Donahoo responded: "Very good. Thanks." *Id.*

On February 27, 2012, Curley emailed an amended order acknowledgment to Donahoo that deleted all erection, installation, and electrical work from the Initial Contract and added a single "engineering" item in the amount of $165,000. Docs. 104 at 13-14, 105-13. The total selling price was thus reduced by nearly $1.5 million to $4,085,955, of which $3,920,955 was for the sale of equipment. *Id*. On March 2, 2012, Donahoo emailed Curley a scanned copy of the signature page for the February 27 amended order acknowledgement bearing his signature. Docs. 104 at 14, 105-14.

On April 27, 2012, Curley sent Donahoo a revised quotation incorporating all the discussed revisions to the January 12, 2012 Initial Contract, for a total selling price of $4,518,024.43. Docs. 104 at 14, 105-17. Soon after, Donahoo requested that the "Tertiary

Section" of the plant's equipment be deleted from the contract, in the amount of $458,800, as Wadley had decided to buy that equipment from another source. Doc. 104 at 14. In accordance with that request, the parties deleted the "Tertiary Section" from the contract and signed a modified version of the contract dated January 12, 2012 (the date of the Initial Contract), reducing the total selling price to $4,059,224.43 (the "Modified Contract").[7] *Id.* at 14-15; Docs. 105-18, 118-1. Although dated January 12, 2012, the Modified Contract was actually prepared and signed by the parties in May 2012 after the "Tertiary Section" equipment was deleted. *Id.*

The Modified Contract, which Curley received and signed in Suwanee, Georgia, states, "The following is our quotation for this 500 TPH Portable Granite Plant." Docs. 105-18, 118-1. Below that are 27 line items, 25 of which are individual pieces of equipment and two of which are services, labeled "Installation/Setup/Calibration of Scales" and "Engineering." *Id.* Each line item is accompanied by an individual "Budgetary Selling Price." *Id.* The 27 line items amount to a total selling price of $4,059,224.43. *Id.* The 25 line items of equipment add up to $3,887,274.40, which is more than 95% of the contract price. Doc. 118 at 2-3. In contrast, the two line items of services total $171,950, which is less than 5% of the contract price. *Id.*

The "Engineering" service item, with a Budgetary Selling Price of $165,000, entails the engineering services provided by Bielski, who furnished engineering services for the

---

[7] 1st Quality maintains that, after the parties signed the Modified Contract, it completely ceased being an intermediary between Wadley and Gaston. Wadley disputes that fact, arguing that, despite what is contained in the Modified Contract and the fact that it chose to contract directly with Gaston to be its general contractor, 1st Quality continued to act as a *de facto* general contractor for the plant.

design and layout of the plant. Doc. 104 at 15. 1st Quality did not furnish any engineering services. *Id.* Instead, 1st Quality contracted with Bielski to perform those services, and 1st Quality's profit margin under the Modified Contract was on markups on the equipment and service items. Docs. 104 at 16, 118 at 14-15. The statement in the Modified Contract that "*Price could vary after final engineering of plant related structures*" refers to the in-house engineering that equipment manufacturers such as Masaba Mining Equipment Company may perform on their structures for the plant. Doc. 104 at 15.

All the equipment 1st Quality sold to Wadley was manufactured outside of Alabama, was movable at the time of identification to the contract for sale, and was shipped to the plant site in Alabama from other states or countries. *Id.* at 16. In accordance with the terms of the Modified Contract, Wadley was responsible for all freight charges from the point of manufacture of the equipment and for all applicable state or local taxes. *Id.* Also in accordance with the Modified Contract, Wadley was responsible for paying 1st Quality within 10-20 days after delivery of each piece of equipment to the site. *Id.* 1st Quality sent invoices for the items of equipment and freight charges to Wadley's office address in Newnan, Georgia. *Id.*; Doc. 105-19. Wadley acknowledges that it received all the subject equipment and invoices from 1st Quality after the equipment was delivered. Doc. 113 at 20-21. However, Wadley ultimately did not pay some of the later invoices because Wadley was dissatisfied with the production of the plant. *Id.* at 21.

After the plant was completed and began operation in late 2012, 1st Quality made subsequent trips to the plant to address various issues with the plant's equipment and to

provide customer support related to the equipment, such as training Wadley's employees in the operation of the equipment.[8] Doc. 104 at 16-17.

## IV.   DISCUSSION

### A.   Motion on Plaintiff's Breach of Contract Claims

#### 1.   Applicable Statute of Limitations

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Alabama's choice of law rules, the law of the forum governs procedural matters. *Reece v. Intuitive Surgical, Inc.*, 63 F. Supp. 3d 1337, 1339 (N.D. Ala. 2014) (citing *Middleton v. Caterpillar Indus., Inc.*, 979 So. 2d 53, 57 (Ala. 2007)). Generally, Alabama law treats statutes of limitations as procedural matters. *Randolph v. Tenn. Valley Auth.*, 792 F. Supp. 1221, 1222 (N.D. Ala. 1992). Thus, Alabama law governs the applicable statute of limitations in this case.

Alabama has adopted the UCC's statute of limitations, which states that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Ala. Code § 7-2-725(1). The UCC applies to contracts for the sale of goods, but not to contracts for the provision of services. Ala. Code § 7-2-102 (providing that the UCC applies to "transactions in goods"). In this case, the parties do not dispute that Wadley filed this lawsuit roughly five years after they entered into the Modified Contract

---

[8] 1st Quality maintains that these subsequent services were incidental to the sale of the equipment and were provided to Wadley at no charge and at 1st Quality's own expense. Wadley disputes that fact, arguing that these services were the predominant purpose of the contract and were provided for in its markups on the equipment and service items.

and the plant became operational. Therefore, if the Modified Contract is for the sale of goods, the UCC's four-year statute of limitations will apply, and Wadley's breach of contract claims will be time-barred. However, if the contract is instead for the provision of services, a six-year statute of limitations will apply, and Wadley's claims will not be time-barred. Ala. Code § 6-2-34(9).[9]

### 2.     Determining Whether Contract is for Goods or Services

"Alabama follows the *lex loci contractus* rule in determining which state's law applies in a contract dispute." *Cherokee Ins. Co., Inc. v. Sanches*, 975 So.2d 287, 292 (Ala. 2007). The Supreme Court of Alabama explained that principle in *Stovall v. Univ. Constr. Co.*, 893 So.2d 1090 (Ala. 2004):

> In a contractual dispute, Alabama law would have us first look to the contract to determine whether the parties have specified a particular sovereign's law to govern. Lacking such a contractual specification, we follow the principle of *lex loci contractus*, applying the law of the state where the contract was formed. That state's law then governs unless it is contrary to the forum state's fundamental public policy.

*Id.* at 1102 (internal citations omitted). In this case, the parties agree that the Modified Contract was formed in Georgia and that Georgia law governs whether the Modified Contract is for goods or services. *See* Doc. 113 at 22, n. 4 ("[Wadley] does not dispute that Georgia law determines whether the contract is for the sale of 'goods' under the UCC."). The undersigned, having examined the contract and finding that it does not specify which state's law should govern, agrees with the parties that Georgia law governs this issue.

---

[9] Although the Court finds that Alabama law governs the statute of limitations issue in this case, it notes that Georgia has also adopted the UCC's four-year statute of limitations for contracts for the sale of goods, *see* Ga. Code § 11-2-725, and also applies a six-year statute of limitations for other contracts, *see* Ga. Code § 9-3-24.

The parties further do not dispute that the Modified Contract is a "hybrid" contract that involves both goods *and* services. In the event of a hybrid contract like the one at issue here, Georgia courts apply the "predominant factor" test to determine whether the UCC applies. *See, e.g., J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 209 Ga. App. 285, 287 (1993) ("When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies, even though a substantial amount of service is to be rendered in installing the goods."). Under the predominant factor test, the Court must determine whether the contract's "'predominant factor, [its] thrust, [its] purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).'" *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1329-30 (11th Cir. 1998) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)). When difficulties interpreting the UCC arise, "it 'shall be liberally construed and applied to promote its underlying purposes and policies.'" *Ole Mexican Foods, Inc. v. Hanson Staple Co.*, 285 Ga. 288, 289 (2009) (quoting Ga. Code. § 11-1-103(a)).

Although no single factor is generally determinative in classifying a hybrid contract as one predominantly for goods or services, the Eleventh Circuit has found "several aspects of a contract particularly significant." *BMC Indus.*, 160 F.3d at 1330. "First, the language of the contract itself provides insight into whether the parties believed the goods or services were the more important element of their agreement." *Id.*; *see also Bonebrake*, 499 F.2d at 958 (stating that language referring to "equipment" is peculiar to goods rather than

16

services). Second, courts should "examine the manner in which the transaction was billed; when the contract price does not include the cost of services, or the charge for goods exceeds that for services, the contract is more likely to be for goods." *BMC Indus.*, 160 F.3d at 1330 (citations omitted). Third, courts should consider the mobility of the items within the contract, as "[m]ovable goods is another hallmark of a contract for goods rather than services." *Id.*

In *BMC Industries*, the Eleventh Circuit considered a contract between two parties for the design, manufacture, and installation of equipment to automate a production line for eyeglass lenses. Applying the "predominant factor" test to the contract, the Court held that it was, as a matter of law, "predominantly a transaction in goods." *Id.* at 1331. The Court reached this conclusion by applying the above factors. Specifically, it found that the contract stated that it was "for the fabrication and installation of automated equipment," which was language peculiar to goods rather than services; more than half the contract price was for that equipment, as opposed to services; and the parties planned for the subject equipment to be moved to a plant once it was completed, thereby constituting movable goods. *Id.* at 1331-32. The Court also noted that the contract's "payment schedule call[ed] for the delivery and acceptance of each automated equipment line to be met by a . . . payment from [the purchaser]." *Id.* The Court reasoned that, if the contract price were being paid predominantly for services as the purchaser claimed, "then the parties would have pegged payments to completion of the engineering and design services, not to the delivery of equipment." *Id.* at 1332.

In this case, the Modified Contract between Wadley and 1st Quality includes 27 line items for a total of $4,059,224.43. Of those 27 line items, 25 are individual pieces of equipment. Those 25 pieces of equipment add up to $3,887,274.40, more than 95% of the contract price. In the contract, the parties agree to have each piece of equipment delivered to Wadley at a particular site, thus indicating the equipment's mobility, and the stated payment schedule requires Wadley to make payments either 10 or 20 days after delivery of each item. In contrast, only two line items are composed of services—"[e]ngineering" and "installation/setup/calibration" of a particular piece of equipment—for a total of $171,950, less than 5% of the contract price. Thus, upon consideration of the "particularly significant" factors set forth by the Eleventh Circuit, the Modified Contract appears to be quite predominantly a transaction for "goods" as contemplated by the UCC.[10]

Georgia courts have applied virtually identical factors when assessing the predominant factor of a hybrid contract. *See, e.g., Suntrust Bank v. Venable*, 299 Ga. 655, 657–58 (2016) (determining the predominant factor of a contract was the sale of goods by considering the language of the contract, whether it involved a movable good, and how it was billed). In *S. Tank Equip. Co. v. Zartic, Inc.*, 221 Ga. App. 503 (1996), the court noted:

---

[10] Notably, Wadley's Initial Complaint (Doc. 1-1), First Amended Complaint (Doc. 10), Second Amended Complaint (Doc. 33) and Third Amended Complaint (Doc. 46) all seem to acknowledge the predominance of the sale of equipment in this case, as they each allege that Wadley contracted with 1st Quality "to design and provide equipment for" a granite rock plant and a rail ballast load out system. It is not until Wadley's Fourth Amended Complaint—its fifth pleading—that Wadley changes its language to allege that it contracted with 1st Quality "to design and build a granite plant" and "to engineer, design, construct and deliver a rail ballast loadout system." Doc. 67 at 15, 17; *see also Pearson v. Ford Motor Co.*, 865 F. Supp. 1504, 1508 (N.D. Fla. 1994) (noting that, when considering a motion for summary judgment, "the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties.") (citing *Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987)).

18

> Factors to be considered in determining the predominant element of a contract include the proportion of the total contract cost allocated to the goods and whether the price of the goods are segregated from the price for services. A smaller proportion of the total price assignable to services, or a failure to state a separate price for services rendered, suggest a contract for the sale of goods with services merely incidental.

*Id.* at 504 (citing *Scandinavian House*, 209 Ga. App. at 287-288). Applying those factors to that case, the court held that a contract for the sale and installation of a chemical mixing tank was predominantly for the sale of goods and subject to the UCC, as more than half the contract price was allocated to equipment. Moreover, in *Scandinavian House*, the court held that a contract for the sale and installation of windows was predominantly for the sale of goods, stating:

> It can hardly be said that the sale of the windows was "incidental" to the transaction. Rather it would appear that the rendition of services was the incidental factor. After all, approximately two-thirds of the cost of the transaction was allocated to the windows.

209 Ga. App. at 288.

Considering the emphasis both the Eleventh Circuit and Georgia courts place on a contract's language and contents, particularly the relative cost of the transaction, it cannot reasonably be said that the Modified Contract in this case, which allocates more than **95%** of the selling price to equipment, or goods, and which includes only two line items of services related to that equipment, is predominantly for services.[11] Even accepting as true

---

[11] Wadley argues that both *Zartic* and *Scandinavian House* are distinguishable from this case, noting several factual distinctions, including that neither case involved a specified output for the purchased goods. Recognizing these distinctions, the undersigned notes that none of the cases proffered by either Wadley or 1st Quality are precisely on point, as none specifically relate to a granite rock plant. For instance, the Court also carefully considered *Heart of Tex. Dodge, Inc. v. Star Coach, LLC*, 255 Ga. App. 801 (2002), a case Wadley argues is "much more akin to this case," which dealt with a contract for the conversion of a Dodge

that the parties impliedly accounted for additional services in the Modified Contract—such as the services 1st Quality provided to Wadley after the plant was in operation—through markups on the equipment, the case law makes clear that the equipment is nevertheless the predominant factor.[12] *See BMC Indus.*, 160 F.3d at 1332 (noting that, if the contract price were predominantly for services rather than goods, then the parties would have pegged payments to those services rather than the goods).

Wadley argues that, despite what the contractual language may indicate, the "heart" of the agreement between the parties was for 1st Quality to design and build a granite plant in its entirety and the individual pieces of equipment referenced in the contract—that is, the "goods"—were merely incidental to that purpose. In support of its argument, Wadley seeks to introduce extrinsic evidence outside the four corners of the contract, which 1st Quality argues is barred by the parol evidence rule.[13] However, for purposes of this Order, the Court need not determine the applicability of the parol evidence rule and whether the evidence proffered by Wadley is appropriate for consideration. Indeed, even considering

---

Durango. Regardless of any factual distinctions, the Court nevertheless finds that the *factors* applied in both *Zartic* and *Scandinavian House*—and numerous other Georgia cases—are applicable here.

[12] For instance, Wadley alleges that 1st Quality received nearly $65,000 of the engineering cost of the plant through markups and approximately $117,000 of the construction cost through a separate agreement with Gaston. Doc. 112-1 at 13-14. Even accepting this as true, the above noted factors still weigh heavily in favor of a finding that the Modified Contract was predominantly for goods. Indeed, the parties pegged the vast majority of payments to equipment rather than explicitly providing for any additional services and the amount allegedly received by 1st Quality for services is still overwhelmingly outweighed by the amount received for equipment.

[13] Georgia's parol evidence rule provides that parol evidence is generally inadmissible "to add to, take from, or vary a written contract." Ga. Code. § 13-2-2(1); *see also Schluter v. Perrie, Buker, Stagg & Jones, P.C.*, 230 Ga. App. 776, 777 (1998) ("Well-established Georgia law provides that matters outside a contract cannot be used to vary or explain the unambiguous terms of an agreement."). Wadley argues that the parol evidence rule does not apply to a predominant factor analysis, noting the Eleventh Circuit's statement in *BMC Industries* that it considered "the circumstances surrounding the [c]ontract" in its analysis.

the extrinsic evidence proffered by Wadley and applying a "totality of the circumstances" test as Wadley asks the Court to do, the undersigned nevertheless finds that the Modified Contract is predominantly one for goods.

In support of its argument that the contract is predominantly for services, Wadley relies heavily on interactions and conversations that took place between the parties prior to the execution of the Modified Contract in May 2012. Prior to the Modified Contract, it is undisputed that, in addition to supplying equipment, 1st Quality agreed to perform a host of services for Wadley, including erection, installation, and electrical services for the plant. As an initial matter, it is not clear to the Court whether that arrangement was primarily one for services rather than goods. *See Cty. Asphalt, Inc. v. Lewis Welding & Eng'g Corp.*, 323 F. Supp. 1300, 1301 (S.D.N.Y. 1970) (applying the UCC to contract for the purchase and installation of asphalt plants as a "transaction in goods"). Indeed, as noted above, in its four prior complaints, Wadley alleged that it contracted with 1st Quality "to design and provide equipment for" a granite rock plant and a rail ballast load out system. *See S. Ill. Stone Co. v. Universal Eng'g Corp.*, 592 F.2d 446 (8th Cir. 1979) (applying the UCC to contract for "the design, manufacture and sale of new rock crushing equipment" intended to increase limestone quarry's production capacity).

However, even assuming that the agreement between the parties *at that time* was predominantly for services, it is undisputed that Wadley thereafter chose to contract directly with Gaston, rather than 1st Quality, for nearly all of those services. At Wadley's request, the parties entered into a Modified Contract, which deleted nearly all erection, installation, and electrical services and left only two line items of service comprising less

than 5% of the total contract selling price.[14] Moreover, at least one of the two items of service was for the installation and setup of some of the sold equipment, which Georgia courts have generally found to be "incidental" to the sale of the goods. *See Zartic*, 221 Ga. App. at 504; *Scandinavian House*, 209 Ga. App. at 288; *Iler Grp., Inc. v. Discrete Wireless, Inc.*, 90 F. Supp. 3d 1329, 1335 (N.D. Ga. 2015) ("Regarding installation services, Georgia courts have found that installation of the goods sold does not amount to a predominantly service-based contract."). Again, even assuming 1st Quality received a markup on the sold equipment for unstated additional services, to find that the overwhelming 25 line items of equipment listed in the Modified Contract are merely incidental to the 2 line items of services related to that equipment would be to ignore the undisputed evidence and controlling case law. The undisputed evidence makes clear that, in the end, Wadley contracted with Gaston, not 1st Quality, to build the plant and with 1st Quality to provide some, but not all, of the equipment for the plant. Indeed, Wadley clearly admits in its response to the motions for summary judgment that 1st Quality "did not have a contract with [Wadley] to construct the plant." Doc. 113 at 14.

The undersigned does not doubt that, over the course of the parties' relationship, Wadley relied on 1st Quality to perform certain services related to the development and construction of the plant. However, the question before the Court is not whether 1st Quality actually performed any services for Wadley at any point, but whether the contract between

---

[14] As 1st Quality notes, Wadley has not cited "a single case from any jurisdiction in which a contract with such a massive proportional difference between the sale of equipment and services has been found to be a service contract not governed by the UCC," Doc. 118 at 27-28. While the Court recognizes that the relative cost of the transaction is not dispositive of the issue, Georgia courts and the Eleventh Circuit have made clear that it is particularly persuasive.

22

the parties is predominantly one for services rather than goods. The undisputed terms of the contract[15], the surrounding circumstances, and controlling case law all negate such a finding.[16] Indeed, when difficulties interpreting the UCC arise, "it 'shall be liberally construed and applied to promote its underlying purposes and policies.'" *Ole Mexican Foods*, 285 Ga. at 289 (quoting Ga. Code. § 11-1-103(a)). Accordingly, 1st Quality's Motion for Summary Judgment on Plaintiff's Breach of Contract Claims (Doc. 103) is granted.

**B.      Motion on Counterclaim for Unpaid Invoices**

In its Motion for Summary Judgment on Counterclaim for Unpaid Invoices (Doc. 106) and supporting memorandum (Doc. 107), 1st Quality argues that Wadley owes it $107,201.92, plus interest and costs, for equipment parts it sold and delivered to Wadley. Wadley admits that it received the relevant equipment parts from 1st Quality and that it failed to pay 1st Quality the sum reflected by the unpaid invoices. *See* Doc. 107-3 at 2; Doc. 113 at 18 ("[Wadley] received invoices after the equipment was delivered.[] However, [Wadley] did not pay the invoices because [it] experienced no noticeable

---

[15] In its sur-reply (Doc. 122), Wadley argues that, because the Magistrate Judge previously assigned to this case noted that it is unclear what the term "engineering" means in the Modified Contract, the contract is ambiguous and extrinsic evidence should be considered. However, that argument is moot because, after development of the record, the parties do not dispute that the "Engineering" service item entails the engineering services provided by Bielski and, regardless, the Court considered extrinsic evidence in its analysis. All other terms in the contract are undisputed.

[16] As 1st Quality notes, "[n]either the Eleventh Circuit nor Georgia courts have identified evidence of a party's subjective intent, goals[,] or understanding of the project as factors for a court to consider under the 'predominant purpose' test." Doc. 118 at 8. Wadley has not provided the Court with any controlling case law refuting that statement.

improvements in the operations of the plant. . . .”). Wadley further admits that it did not return the subject equipment to 1st Quality. Doc. 107-3 at 2.

Wadley simply argues that (1) if 1st Quality’s Motion for Summary Judgment on Plaintiff’s Breach of Contract claims is denied, it may be entitled to a set-off and (2) if that motion is granted, summary judgment on 1st Quality’s counterclaim should nevertheless be denied because “there are questions of law and fact whether the equipment provided met the implied warranty of fitness for a particular purpose.” Doc. 113 at 35. However, both of Wadley’s arguments fail for the reasons below.

1.    Set-Off

Regarding Wadley’s set-off argument, it acknowledges that it may be entitled to a set-off only if 1st Quality’s motion for summary judgment on Wadley’s breach of contract claims is denied. However, for the reasons set forth above, the Court finds that Wadley’s breach of contract claims are time-barred and that 1st Quality’s motion for summary judgment should be granted. As such, Wadley is not entitled to a set-off. *See Smith v. Jackson*, 241 F. 747, 773 (5th Cir. 1917) (“[I]t is well settled that where one party has a judgment the other can never set off against that judgment a claim not reduced to judgment.”); *Glovis Ala., LLC v. Richway Trans. Servs. Inc.*, 2020 WL 3630739, at *11-12 (S.D. Ala. July 3, 2020) (finding assertion of a set-off before a claim is reduced to judgment to be premature because “Alabama statutory law . . . limits set-off rights to claims reduced to judgment.”).

2. <u>Implied Warranty of Fitness</u>

Regarding Wadley's implied warranty of fitness argument, Wadley failed to raise an implied warranty of fitness allegation in any of its previous complaints, including the operative Fourth Amended Complaint, or its answer to 1st Quality's counterclaim. Instead, Wadley raises the argument for the very first time in its response to 1st Quality's motions for summary judgment. The Eleventh Circuit has made clear that a party generally may not assert new allegations in response to a summary judgment motion. *See Cacciamani v. Target Corp.*, 622 F. App'x 800, 804 (11th Cir. 2015) (affirming district court's refusal to consider plaintiff's new theory raised for the first time in response to motion for summary judgment and deeming it "too little, too late"); *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment.") (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Thus, Wadley's attempt to inject a novel theory into this case, nearly three years after its commencement and in response to 1st Quality's motions for summary judgment, is improper. Accordingly, the Court declines to consider it, and 1st Quality's Motion for Summary Judgment on Counterclaim for Unpaid Invoices (Doc. 106) is granted.

**V.   CONCLUSION**

For the reasons set forth above, the undersigned finds that 1st Quality is entitled to summary judgment on Plaintiff's breach of contract claims and its own counterclaim for unpaid invoices. Accordingly, it is ORDERED that:

1.     1st Quality's Motion for Summary Judgment on Plaintiff's Breach of Contract Claims (Doc. 103) is GRANTED.

2.     1st Quality's Motion for Summary Judgment on Counterclaim for Unpaid Invoices (Doc. 106) is GRANTED.

3.     By **January 4, 2021**, 1st Quality must file with the Court documentation setting forth any interest and costs incurred in connection with the unpaid invoices. Wadley may file a reply by **January 25, 2021**.

DONE this 14th day of December, 2020.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE